## SUPREME COURT.

THE PEOPLE &C., THE TRUSTEES OF THE SAILOR'S SNUG HARBOR, JAMES BROWN, and others, agt. JOHN KERR and others.

The act of the legislature of 1860, authorizing the defendants (named as grantees,) to construct a railroad in the city of New York, running through Green street, University Place, Broadway, and other streets, on a route commonly known as the "Broadway Parallel," is *unconstitutional* and *void*, as taking private property for public use without just compensation therefor.

The *fee of the streets* of the city of New York is in the *city corporation*; which fact authorizes them to *demand compensation* for this (private) property, which is authorized to be taken by the act; but which by its terms virtually enjoins the corporation from claiming.

The *legislature* have no authority to establish the *price* to be paid for corporate franchises or private interests to be taken for public use. Therefore, the provision in section 2 of the act subjecting the railroad to the payment, to the corporation, of the same *annual license fee* as is now paid by other city railroads ($20 per car,) amounts to nothing, saying nothing of the gross inadequacy of the price to the privilege.

Although the plaintiffs who are the owners of the land abutting on the streets to be occupied by the contemplated railroad, cannot complain of the construction of the road on the ground that they are injured as *tax-payers* of the city, (see *Dolittle* agt. *Supervisors*, 18 *N. Y. R.*, 162; *S. C.*, 16 *How. Pr. R.*, 512,) nor upon the ground that they are the *owners of the fee* of such lands, (the fee being in the corporation by purchase,) yet they can complain of the construction of the road as specially injurious to them, for the reason that it would be an *indictable nuisance*, after having been declared unconstitutional as against the corporation.

*New York Special Term, January,* 1861.

THE legislature, at their last session, enacted a law authorizing John Kerr and others, defendants in this action, to construct a railroad in the city of New York, running through Green street, University Place, Broadway, and other streets, on a route commonly known as the "Broadway Parallel," to be constructed on the most approved plan for city railroads, and run as often as the convenience of passengers may require, and to be subject to such reasonable regulations as the common council may prescribe, and to the same fee for license for each car as is now paid by

other city railroads in the city of New York, and author-
izing the said grantees, and their assigns, to charge the
same rate of fare as is now charged by such other city
railroads.

The grantees are authorized to run upon the track of
other railroads in the prescribed route, and in case they
cannot agree with the owners of such route, respecting the
compensation, then it is to be ascertained according to the
provisions of the general railroad act passed in 1850.

The act then contains the following provision in regard
to compensation for such real estate as may be taken, viz:
Should any real estate, or interest therein, be required, for
the purpose of constructing said railroad on said route or
routes as above specified and authorized, for which the
persons above named, or their assigns, shall be unable to
agree with the private owner or owners for the use or pur-
chase thereof, they may acquire the right to use, or title to
the same, in the manner, &c., specified in the said general
railroad act of 1850.

The act further provides that " in all cases, the use of
said streets and avenues for the purpose of said railroad as
herein authorized, shall be considered a public use, con-
sistent with the uses for which the mayor, aldermen and
commonalty of said city hold said streets and avenues."

The mayor, aldermen, &c., are prohibited from allowing
any other company, formed under the general railroad act
of 1850, to construct a railroad on the said route, and from
doing any other act to hinder, delay or obstruct the con-
struction or operation of the railroad authorized by this
act; and it makes it the duty of the mayor, common council,
and other officers of the city, to promote the construction
and protect the operation of the railroad; and declares
that any act or thing, done in violation of that act shall be
inoperative and void; and directs that all actions relating
to, affecting, or arising under this act, or the authority
thereby given, shall be commenced in the supreme court of

the first judicial district; repeals all laws inconsistent therewith, and directs that it shall take effect immediately.

A temporary injunction was granted by this court in July last, restraining John Kerr and others, the grantees named in the said act, and the mayor, aldermen, &c., from laying down the railroad, and from doing any act or thing under the said act of the legislature, and restraining the mayor, aldermen, &c., from doing any act in furtherance of, or to promote the construction of the railroad so authorized, or in aid of the said grant.

The plaintiffs now move the court to make the injunction permanent pending the litigation.

The plaintiffs, other than the people, allege that they are the owners of land along the line of some of the streets where the route of the proposed railroad is authorized to be laid; and that they are the owners of the fee of the streets in front of their lands, subject to the public use thereof as streets, and that the laying of a railroad track would be specially injurious to them, in obstructing the approach to and use of their factories, and buildings erected on their lands fronting on the streets so to be occupied by the railroad; and that their lands will be deteriorated in value, and that the general object and public use of the streets will be obstructed; that the privileges granted by this act are worth more than a million of dollars, and would, if sold, produce that sum; and that the plaintiffs, other than the people, are interested as tax-payers, in preventing the grant of such valuable franchises belonging to the city of New York, without compensation; that the railroad will constitute a nuisance as to the public and as to the plaintiffs, who are the owners of land along the said route.

That the grantees are about laying down the rail-track so authorized, without making any compensation for the use of the streets to be occupied thereby, either to the plaintiffs whose lands abut upon the streets so to be used,

or to the city corporation, in violation of the constitution.

That the plaintiffs fear that the mayor, aldermen, &c., will proceed to give their assent to the said act, and to the grant therein, to their great damage as owners of property on the streets, and as citizens and tax-payers.

The plaintiffs also allege that the act in question was adopted by less than two-thirds of the members elected to the legislature, in violation of the article in the constitution requiring the public moneys or property to be appropriated for local or private purposes only by the assent of two-thirds of all the members elected.

The defendants contest the statements of the plaintiffs, particularly in respect to their title to the streets and avenues in front of the land owned by them along the said route. The defendants exhibit deeds, showing grants in fee to the mayor, aldermen and commonalty of the city of New York, for the land constituting the streets upon which the lands of all the individual plaintiffs, including also the Sailor's Snug Harbor, front, (except the lands of the plaintiff Varian,) in trust for the use of the public as streets.

The land constituting that part of Broadway upon which the land of the plaintiff Varian fronts, is shown by affidavits to have been in use as a public street or highway for over one hundred and fifty years, or to have been acquired under the act of 1813, when the line of Broadway was straightened, and its locality, in some places, was changed for that purpose several years since.

WILLIAM C. NOYES *and* WILLIAM ALLEN BUTLER, *for the plaintiffs.*

CHARLES O'CONOR *and* WILLIAM M. EVARTS, *for the defendants.*

LEONARD, Justice. The right of the plaintiffs to maintain this action depends wholly upon the force and effect of the statute granting to John Kerr and others the privilege

of constructing, for their own personal advantage, a railroad through some of the principal streets of the city of New York.

The legislative power is supreme, regulated and restrained only by the constitution of the United States, and the constitution of the state in which we live.

It is claimed by the plaintiffs that the grant in question is repugnant to the constitution in the manner of its adoption by the legislature, and also in its provisions.

The plaintiffs, who are the owners of land abutting on the streets to be occupied by the contemplated railroad, claim to have a standing in court on the ground that their private rights will be invaded unlawfully.

That they are injured as tax-payers and members of the city corporation, because municipal franchises of immense value are to be taken without any compensation or process of law. That the contemplated railroad will be specially injurious to them by preventing or obstructing the accustomed access to their lands fronting on the streets proposed to be taken, and therefore constituting, as to them, a nuisance. And also on the ground that the fee of the streets to the centre thereof, so far as their lands abut thereon, is in them, and that the grantees are about to occupy the streets with their railroad, and subvert the soil, &c., without making them any compensation therefor.

Any of these grounds, if valid, will be sufficient to give the plaintiffs, who have been referred to, a standing in court, and a right to have their controversy in this case adjudicated. If not valid, it will follow, of course, that such plaintiffs cannot maintain this action, and that, as to them, the injunction must fall.

The claim made by these plaintiffs, based upon the fact that they are tax-payers or members of the city corporation, gives them no ground to invoke the aid of the court.

This proposition is, I think, distinctly decided in the case of *Dolittle* agt. *The Board of Supervisors*, (18 *N. Y. Rep.*,

162.) The court of appeals declare that no private person, or number of persons, can assume to be the champions of the community. That a contrary rule would be productive of very great inconveniences and endless litigation.

The claim of these plaintiffs to the fee of some portions of the streets over which the route of the proposed railroad is to pass, is, I think, also without foundation. The evidence of title on the part of these plaintiffs is simply a broad assertion that the fee of the streets in front of their lands, to the centre thereof, is in them respectively, and they so assert because they own lands abutting on the streets.

The defendants produce deeds from the former owners, through whom these plaintiffs (except Mr. Varian) derive title to their lands, to the corporation of the city of New York, conveying the title to the streets in fee in trust for the use of the public as streets. It has been held by the late supreme court, on the opinion of some of the most eminent judges of that court, that where the owners of land in the city of New York had caused their lands to be laid out into city lots, with streets and avenues running through them, and had filed a map thereof, and such streets had been left open for the use of the public, that when the streets were subsequently opened, and the fee taken by the municipal government for streets, under the authority of law, that neither the former owner of the land, or the owners of lots abutting thereon, were entitled to anything more than a nominal compensation for the land so taken for public use. (19 *Wend. R.*, 128; *in the matter of Thirty-second street*, 1 *Hill's R.*, 189 *and* 190; *in the matter of Twenty-ninth street; and in the matter of Thirty-ninth street.*)

The court held in those cases that the acts and proceedings of the owner showed an intention to dedicate the land to the use of the public for the very purpose for which it was finally taken. If then the mapping out of streets, and leaving the ground open for the use of the public, and finally the filing of the map, is such evidence of a dedication of

the land as to deprive the owner of any claim for compen-sation beyond a merely nominal sum, instead of the actual value, when the land is finally taken by public authority, it will be quite unreasonable to hold that the former owner, or any of his grantees, will be entitled to claim any other interest in the streets than the public in general enjoy, after a release or conveyance of the land to the city for the use of the public as a street.

The street in front of the land of the plaintiff Varian, at the corner of Broadway and Twenty-ninth street, was not so conveyed. The title to the land in that part of Broad-way was acquired in another manner, equally conclusive so far as he is concerned.

When Broadway was straightened some years since, the land then taken for that purpose was acquired under the act of 1813, in relation to the opening of streets in the city of New York; and the land so acquired must have been taken only upon making full compensation therefor, and by the said act is vested in the mayor, aldermen, &c., of the city of New York in fee, in trust to be kept open as a pub-lic street.

If the lands of Mr. Varian front on such parts of Broad-way as remain unchanged in location, then, on the authority of the learned treatise of Mr. Justice Hoffman, of the superior court, " upon the estate and rights of the corpora-tion of the city of New York," the fee passed to the state of New York at the close of the revolution, and was vested by the said act of 1813, section 192, in the mayor, aldermen, &c., of the city of New York, for the use of the public as a street. ( *Vide Hoffman's Treatise, p.* 291, 292, 293, 294, *&c.* )

If the fee of the streets, or any of them, were not actually vested in the corporation of the city of New York, as I think it is, and if the owners of the land fronting on the streets are admitted to have some remote right of reversion, in case the streets shall cease to be used as public high-ways, the possibility of a reverter is too remote and con-

tingent to be of any appreciable value. (*Wetmore* agt. *Story*, 22 *Barb.*, 488; *Drake* agt. *The Hudson River R. R.*, 7 *Barb.*, 508.)

In my opinion the defendants are correct in the position which they have taken at the argument of this motion, that the title to the streets, over which the contemplated railroad is to be constructed, is vested in the mayor, aldermen, &c., of the city of New York.

The case of *Williams* agt. *The New York Central R. R. Co.*, (16 *N. Y. Rep.*, 97,) was referred to by the counsel for the plaintiffs on the argument of this motion, to sustain their position that the owners of land fronting on the highway or streets are entitled to compensation for their interest in the soil of the streets when it is taken for a railroad.

An examination of that case will show that it is not an authority for the plaintiffs on the point in question.

The learned judge of the court of appeals, who delivered the opinion of the court in that case, states that it was conceded that the public acquired no more than the ordinary easement or right to use the premises as a highway, and that the plaintiff continued to be the owner of the fee in respect to unsold lots to the centre of the street, subject only to this easement.

The opinion then refers to the case of *Drake* agt. *The Hudson River R. R. Co.*, (7 *Barb. R.*, 508,) involving a claim for compensation by the owners of land fronting on streets in the city of New York, which had been occupied by the Hudson River R. R., wherein the decision had been adverse to the claimants, and had been cited as authority for the N. Y. Central R. R. Co.

The learned judge then states that the case of *Drake* had been decided adversely to the plaintiffs therein on the ground that they had no title in the soil of the streets; and he then remarks that " no case is likely to arise in the city of New York which would be entitled to any weight in the decision of that question, for the reason that it is claimed,

and apparently with justice, that as to a large portion of the streets of that city, the fee of the land, and not a mere easement, is vested in the corporation."

A reference to the laws under which the highways and streets in the country are laid out will show the difference existing in regard to the rights of owners of land fronting thereon, and those of similar owners of land in the city of New York. In the country the right taken from the private owner is a mere easement in favor of the public over the land; the fee remains undisturbed. In the city of New York the fee is taken and paid for by the city.

No further interest or title remains in the former owner than the rest of the public enjoy therein.

The plaintiffs have no right to maintain this action by reason of the intention of the defendants not to make compensation to them for any supposed interest of the plaintiffs in the land to be occupied by the route of this railroad.

The remaining ground upon which the plaintiffs, other than the people of the state of New York, claim to have sustained an injury, and to maintain this action, is that the railroads which the defendants are about to construct will be a nuisance specially injurious to them.

Since the resolutions adopted by the late court of errors in the case of *Bloodgood* agt. *The Mohawk and Hudson River R. R. Co*, (18 *Wend. R.*, 77,) a railroad cannot be deemed *per se* a nuisance. The construction of a railroad was there declared to be a public improvement, and that private property might lawfully be taken therefor, on making compensation, when authorized by the legislature.

If the defendants are lawfully authorized to construct the proposed railroad, then it cannot be, when constructed, a public nuisance.

Private inconvenience must give way or be overlooked, if the construction of this railroad is a public convenience, duly and properly authorized by a valid enactment of the legislature.

It has been repeatedly adjudged that it is a violation of the trust under which the city corporation hold the title to the streets, for the municipal government to authorize or permit the construction of railroads in the streets of the city of New York, without the authority of the legislature.

It may also be remarked that there has never been any grant of authority by the legislature of this state to construct any railroad in the streets of the city of New York, nor in the streets of any other city, so far as I am aware, without the consent of the municipal government, prior to the session of the legislature of 1860.

The charters of the Harlem Railroad and of the Hudson River Railroad required the consent of the common council as a pre-requisite to the use of the streets. All the other city railroads had the authority of the legislature, and the consent of the city government before they were put into operation, although some of them had the permission of the common council prior to the legislative authorization.

By the present grant to the defendants, no concurrence or consent of the municipal government has been deemed by the legislature to be necessary before the railroad shall be laid or put in operation. No such consent is mentioned in the act. On the contrary, it is provided that " the use of the streets and avenues for the purposes of the said railroad shall be considered a public use, consistent with the use for which the mayor, aldermen and commonalty hold the said streets and avenues; and by section four it is made the " duty of the mayor, common council, and corporation officers, to do such acts as may be needful to promote its construction, and protect its operation;" and further, " any act or thing done in violation thereof (the act) shall be inoperative and void."

The meaning of this language seems to be that it is not necessary for the city government to be called on for any consent to the construction or operation of the proposed railroad. And it is enjoined upon the mayor, common

council, and all other corporation officers, as a duty, to pro-
mote the construction thereof, and protect its operation;
and if they do anything of a contrary effect—if they ob-
struct or prevent the construction or operation of the
railroad, their acts shall be nugatory and void.

The control, regulation and management of the streets of
the city of New York, as against these grantees who are
named in the act, is thereby taken from the city govern-
ment, so far as such control, regulation or management will
obstruct the construction or operation of the railroad.

The authority given to the common council in the second
section of the act, to prescribe reasonable rules and regula-
tions in respect to the railroad, does not limit the effect of
the subsequent provisions which are above stated.

The meaning of the whole provision, taken together, is
plain, that no consent of the city government is required
before the track shall be laid, and the road put into opera-
tion; and if the common council pass any ordinance, or if
any corporation officer, including the mayor, does any act
which will be inconsistent with the duty enjoined upon
them by that statute, such ordinance or act is declared in
advance to be void.

Should the common council direct, or should the corpora-
tion counsel institute, any proceedings for the purpose of
obtaining compensation for the streets and avenues to be
taken by these grantees for the use of the proposed railroad,
the ordinance or proceedings would be, under this enact-
ment if valid, nugatory and void.

The grantees would justly consider a demand for com-
pensation for the use of the streets, on the part of the city
government, as a violation of the duty enjoined by the act.
Such a claim on the part of the city of New York could not
properly be considered as promoting the construction of
the railroad. On the contrary, such a demand would be a
direct obstruction and hindrance to the grantees.

If the act of the legislature now in question is to be

deemed valid, there can be no doubt, I think, that the corporation of the city of New York are thereby enjoined from claiming any compensation for any franchise or land infringed or taken in the construction of the proposed railroad, or of which the corporation may be thereby divested.

It has been said that the city franchises and the land in the streets are not taken without compensation, inasmuch as by section two of the act, the said railroad is subjected to the payment of the same annual license fee for each car as is now paid by other city railroads. That fee is twenty dollars per annum for each car; and if one hundred cars should be run, the total revenue to the city for a privilege worth one million of dollars would amount to two thousand dollars.

Without, however, considering the manifest inadequacy of price for the privilege to be obtained, there is no authority for the legislature to establish the price to be paid for corporate franchises or private interests to be taken for public use.

It is undoubtedly true that the act of the legislature grants certain franchises to John Kerr and others, but it is not equally clear that any franchises are thereby granted which belong to the corporation of the city of New York.

The franchises which are granted are not now used or enjoyed by the city government, nor can that government by its own authority call them into existence. The city corporation cannot grant a railroad route through the streets without a violation of the trust under which they hold the title thereto.

A franchise is a privilege conferred by grant from the government, and vested in individuals or a corporation. The right to construct a railroad, or to authorize others to construct one over this route, or to receive or to grant the right to take fare from passengers on such a road or track, has never been granted to or possessed by the corporation of the city of New York. I have referred to the subject of

franchises, because the interference with the city franchises by this act was frequently urged upon my attention by one of the counsel for the plaintiffs.

It may be, and probably is, against our sense of reason and right for the legislature to grant a monopoly to individuals, of incalculable value, to be created out of and over the corporate rights of the city of New York in the streets, wherein those individuals had no other rights than such as belonged to any other ·member of the whole people of the city, without any process of law or compensation to be paid therefor; nevertheless it will be impossible, I think, to find any restraint in the constitution upon such an exercise of legislative power, unless it be found in the clause forbidding private property to be taken for public use without just compensation therefor. I am unable to see any objection, legally, against applying that provision of the constitution in this case.

The title or fee of the streets is in the city corporation. That constitutes the first element of right to demand compensation. Because the title so held is in trust for the use of the public as streets or highways, that fact does not authorize the present grant to be made without compensation. The municipal government can lawfully apply the compensation to be received for the improvement of other streets, or for other public benefit. The right to receive compensation will not fail, for want of the right lawfully to dispose thereof. The compensation will be paid for the benefit of the *cestui que trust*, who are, in this case, the public.

Conceding, therefore, or rather assuming that the act of the legislature has been shown to be unconstitutional as against the corporation of the city of New York, does it follow that the private owners of land abutting on the streets to· be occupied by the proposed railroad can complain of the construction thereof as a nuisance specially injurious to them?

People agt. Kerr.

I think they can. The proposed railroad is unauthorized by law, because the act of the legislature is invalid for its repugnance to a constitutional provision.

The railroad, if constructed, would, for these reasons, be an indictable nuisance, a public wrong.

The affidavits on the part of these plaintiffs show that they will be put to special inconvenience in the approach to their premises by the proposed structure and the operation thereof.

There are other questions involved in the case, as to the manner of the adoption of the act, and as to the right of the People, &c., to maintain this action, &c., which I forbear to discuss, as I have arrived at a conclusion adverse to the claim of the defendants, without considering their other objections herein.

I was much struck at the argument with the incongruity of the people by their attorney-general attempting to vindicate the corporate rights of the city of New York in the streets, in an action wherein that corporation, which was most affected by the act, made no complaint in respect to it, wherein also the people, by their highest authority, the legislature, had passed the very act or law which the same people now sought to annul. No reference has been made to the motion on the part of the mayor, aldermen, &c, as a demurrer to the complaint has since been heard, and is simultaneously herewith decided, so as to render a separate decision in their behalf upon this motion unnecessary.

The motion to continue the injunction till the hearing and decision of the action is granted, with ten dollars costs to the party finally prevailing therein.